# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CODY LAIDLAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0821-LWW |
| | ) | |
| GIGACQUISITIONS2, LLC, | ) | |
| RALUCA DINU, AVI S. KATZ, | ) | |
| NEIL MIOTTO, JOHN MIKULSKY, | ) | |
| and GIL FROSTIG, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 18, 2022
Date Decided: March 1, 2023

Michael J. Barry, GRANT & EISENHOFFER, P.A., Wilmington, Delaware; Michael Klausner, Stanford, California; *Attorneys for Plaintiff Cody Laidlaw*

John L. Reed, Ronald N. Brown & Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Melanie E. Walker & Gaspard Rappoport, DLA PIPER LLP (US), Los Angeles, California; *Attorneys for Defendants GigAcquisitions2, LLC, Raluca Dinu, Avi S. Katz, Neil Miotto, John Mikulsky & Gil Frostig*

**WILL, Vice Chancellor**

This decision considers a motion to dismiss breach of fiduciary duty claims against the directors and the controlling stockholder of GigCapital2, Inc., a special purpose acquisition company (SPAC). At first glance, readers may think I inadvertently re-published an earlier decision. The legal theories presented and defendants named are largely indistinguishable from those in this court's recent *Delman v. GigAcquisitions3, LLC* decision.[1] But a different GigCapital-affiliated SPAC is my present focus.

GigCapital2, like its sister entity, did not deviate from the typical SPAC playbook. Public stockholders who purchased units in the initial public offering were given the choice between redeeming and recouping their $10 per share investment plus interest or investing in the post-merger company. The SPAC's fiduciaries were allegedly incentivized to minimize redemptions in order to secure returns for the sponsor, which purchased a 20% stake at a nominal price.

The defendants are once more accused of acting on this conflict by issuing a false and misleading proxy statement that impaired public stockholders' ability to make an informed redemption decision. Specifically, the defendants allegedly failed to disclose the net cash per share that the SPAC would contribute to the merger. Given that net cash per share would provide a strong indication of value post-merger

---

[1] __ A.3d __, 2023 WL 29325 (Del. Ch. Jan. 4, 2023).

and that the SPAC would see significant dilution and dissipation of cash upon closing, such information would have been material to public stockholders choosing between investing and redeeming.

In *GigAcquisitions3*, this premise led the court to conclude that the plaintiffs pleaded a reasonably conceivable breach of fiduciary duty claim. So too here. I further conclude it is reasonably conceivable that the defendants withheld material information about financing terms that harmed public stockholders.

The defendants' arguments in support of dismissal are familiar. Nearly all were previously considered and rejected in *GigAcqusitions3*. Unsurprisingly, they fare no better here. The motion to dismiss is denied.

## I.    FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the plaintiff's Verified Class Action Complaint (the "Complaint") and the documents it incorporates by reference.[2]

---

[2] Verified Class Action Compl. (Dkt. 1) ("Compl."); *see In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) ("The court may take judicial notice of facts publicly available in filings with the SEC."). Citations in the form of "Defs.' Opening Br. Ex.___" refer to exhibits to the Unsworn Declaration of Kelly L. Freund to Defendants' Opening Brief in Support of Their Motion to Dismiss Verified Class Action Complaint. Dkts. 12, 13.

### A. Gig2, its Sponsor, and its Board

GigCapital2, Inc. ("Gig2" or the "Company") is a Delaware corporation formed as a special purpose acquisition company on March 6, 2019.[3] Defendant Avi Katz founded Gig2 as one of his seven SPAC endeavors and held a controlling interest in its sponsor, GigAcquisitions2, LLC (the "Sponsor").[4]

Katz caused the Sponsor to incorporate Gig2 in Delaware.[5] He appointed himself as Gig2's Chief Executive Officer, its Executive Chairman, and a member of its board of directors (the "Board").[6] Katz, through the Sponsor, also selected the other four initial Board members: Raluca Dinu (his spouse), Neil Miotto, John Mikulsky, and Gil Frostig.[7] These directors each held additional roles at GigCapital-related businesses.[8]

### B. The Founder Shares

Shortly after its incorporation in March 2019, Gig2 issued common stock to the Sponsor, Northland Gig 2 Investment LLC, and EarlyBirdCapital, Inc. amounting to approximately 20% of Gig2's post-IPO equity for an aggregate price

---

[3] Compl. ¶¶ 1, 37.

[4] *Id.* ¶¶ 4, 25, 36; *see In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 793-96 (Del. Ch. 2022) (discussing typical SPAC structure).

[5] Compl. ¶ 37.

[6] *Id.* ¶ 41.

[7] *Id.* ¶¶ 9, 41-43.

[8] *See infra* notes 113-19 and accompanying text.

of $25,000 or $0.0058 per share (the "Founder Shares").[9] EarlyBird was an underwriter of Gig2's initial public offering and Northland was a subsidiary of the other IPO underwriter, Northland Securities, Inc. (d/b/a Northland Capital Markets).[10] Specifically, Gig2 issued 4,018,987 Founder Shares to the Sponsor and a total of 288,513 Founder Shares to Northland and EarlyBird.[11]

The Sponsor, Northland, and EarlyBird agreed not to redeem their shares or participate in any liquidation.[12] The Sponsor, Northland, and EarlyBird were also subject to a lock-up that prohibited them from transferring, assigning, or selling their shares for 12 months or until Gig2's stock reached a specified price.[13]

### C.    Gig2's IPO

On June 10, 2019, Gig2 completed its IPO.  It sold 15 million units to public investors for $10 per unit and raised total proceeds of $150 million.[14] Each IPO unit consisted of one share of common stock, a warrant to purchase one share of common stock at an exercise price of $11.50 per share following a merger, and a right to

---

[9] Compl. ¶ 7; *see also* Defs.' Opening Br. Ex. 1 ("Prospectus") at 12-13; Defs.' Opening Br. Ex. 5 ("Proxy") at 5.

[10] Compl. ¶ 7; *see also* Prospectus at 128.

[11] Compl. ¶ 7.

[12] Compl. ¶ 8; *see also* Prospectus at 15.

[13] Prospectus at 14.

[14] Compl. ¶ 38; *see also* Prospectus at 8.  The underwriters exercised their overallotment of 2,250,000 units, generating additional gross proceeds of $22.5 million.  Compl. ¶ 38.

4

receive—at no cost—1/20 of a share following a merger.[15]  The share of common stock was redeemable for $10 plus interest and carried liquidation rights.[16]  That is, if Gig2 failed to timely identify a target, the SPAC would liquidate and public stockholders would recoup their investments with interest.[17]  If Gig2 identified a target, public stockholders could opt to redeem their shares for $10 per share plus interest.[18]  A public investor could redeem her shares while retaining the warrants and rights included with the units.[19]

The funds generated by the IPO were deposited in a trust.  These funds could only be used to redeem shares, to contribute to a merger, or to return public stockholders' investments if Gig2 were to liquidate.[20]

Gig2 completed several private placements concurrently with the consummation of its IPO.  The Sponsor, Northland, and EarlyBird purchased a total

---

[15] *Id.*; *see also* Prospectus at 8.

[16] Compl. ¶ 38; *see also* Defs.' Opening Br. Ex. 6 § 9.2; Prospectus at 19-20, 25-26.  The transaction described in this decision as a merger is technically a series of business combinations involving Gig2's merger subsidiary and the target, leading to the target becoming a subsidiary of Gig2.  *See* Proxy at Cover Page, A-1-1 to A-1-2, B-1 to B-2.

[17] Compl. ¶ 8; *see also* Prospectus at 25-26.

[18] Compl. ¶ 8; *see also* Prospectus at 19-20.

[19] Compl. ¶ 38.

[20] *Id.*

5

of 567,500 "Private Placement Units" for $10 per unit.[21]  Each Private Placement Unit consisted of one share of common stock, one warrant, and one right to receive 1/20 of a share upon consummation of the merger.[22]  The proceeds of the private placements would be used to pay the IPO underwriting fee and provide Gig2 with working capital.[23]  The recipients of the Private Placement Units committed not to redeem their shares and not to participate in any liquidation.[24]  These units were also subject to a lock-up.[25]

### D.    The Extensions

On November 2, 2020, Gig2 filed a definitive proxy statement with the Securities and Exchange Commission recommending that stockholders vote to approve an amendment to Gig2's certificate of incorporation to extend the deadline to consummate a merger until March 10, 2021.[26]  The proxy explained that an extension was necessary because "[t]he Board . . . believe[d] that there will not be sufficient time before December 10, 2020, to complete a Business Combination."[27]

---

[21] *Id.* ¶ 7.  The Sponsor, Northland, and EarlyBird purchased 481,250, 56,350, and 29,900 Gig2 units, respectively.  *Id.*  In another private placement, Northland Capital Markets purchased 120,000 shares (rather than units) at a price of $10 per share.  *Id.* ¶ 40.

[22] *Id.* ¶ 7.

[23] *Id.*

[24] *Id.* ¶ 8; *see also* Prospectus at 14-15; Proxy at 448.

[25] Proxy at 449; *see supra* note 13 and accompanying text.

[26] Compl. ¶ 46; Defs.' Opening Br. Ex. 7 ("First Extension Proxy") at Cover Page.

[27] First Extension Proxy at Cover Page, 3.

The proxy also told public stockholders that they could exercise their redemption at that time, even if they voted in favor of the extension amendment.[28] The extension amendment passed, and public stockholders redeemed 579,881 shares, withdrawing $5,857,340 from the trust account.[29]

On February 24, 2021, Gig2 sought stockholder approval for another amendment to its certificate of incorporation to extend the merger deadline until June 10, 2021.[30] The proxy filed in connection with this proposal again explained that "more time" was needed to complete a merger.[31] The second extension amendment passed, and public stockholders redeemed 1,852,804 shares for $18,715,459.[32]

The redemptions associated with the two extension amendments reduced the cash in the trust account to approximately $149.6 million.[33]

---

[28] *Id.* at 9-10.

[29] Compl. ¶ 46; Defs.' Opening Br. Ex. 10 at Item 5.07.

[30] Compl. ¶ 51; Defs.' Opening Br. Ex. 13 ("Second Extension Proxy") at Cover Page.

[31] Second Extension Proxy at 2. Again, public stockholders were allowed to redeem their shares even if they voted in favor of the extension amendment. *Id.* at 14; Compl. ¶ 51.

[32] Compl. ¶ 51; Defs.' Opening Br. Ex. 14 at Item 5.07.

[33] Compl. ¶ 51; Defs.' Opening Br. Ex. 14 at Item 7.01.

### E. The Mergers

Gig2 began searching for a merger target after its formation.[34] Eventually, Gig2 identified UpHealth Holdings, Inc. and Cloudbreak Health, LLC.[35] UpHealth was a digital health company operating in integrated care management, digital pharmacy, global telehealth, and behavioral health.[36] Cloudbreak was a unified telemedicine and video medical interpretation solutions provider.[37]

The Board did not form a special committee and "provided no meaningful oversight" over the negotiations, which were "dominated" by Katz and Dinu.[38] Gig2 did not obtain a fairness opinion or retain a financial advisor in connection with the transactions.[39]

On November 23, 2020, Gig2 announced that it had entered into merger agreements with UpHealth and Cloudbreak.[40] Under the agreements, UpHealth stockholders and Cloudbreak unitholders and optionholders would receive

---

[34] Before settling on UpHealth and Cloudbreak, Gig2 entered a non-binding letter of intent with Waste to Energy Partners LLC (d/b/a Bolder Industries) on October 27, 2020. Defs.' Opening Br. Ex. 8 at Item 8.01.

[35] Compl. ¶ 47.

[36] Proxy at 34.

[37] *Id.*

[38] Compl. ¶ 60.

[39] *Id.* ¶ 61.

[40] *Id.* ¶ 47. The merger agreements provided that UpHealth and Cloudbreak would survive the mergers as wholly owned subsidiaries of Gig2. *See* Proxy at Cover Page, A-1-1 to A-1-2, B-1 to B-2.

consideration in the form of Gig2 common shares.[41]   Upon consummation of the mergers, Gig2 would change its name to UpHealth, Inc. ("New UpHealth") and its common stock would trade on the New York Stock Exchange under the symbol "UPH."[42]

### F.    PIPE and Convertible Notes Financings

The mergers were contingent on Gig2 having at least $150 million in total cash.[43]   After the redemptions associated with the extension amendments, the Company's cash had fallen below the $150 million threshold.[44]  Consequently, Gig2 pursued financing arrangements to minimize the risk that it would fail to meet this condition.[45]

On January 20, 2021, Gig2 entered into private investment in public equity (PIPE) subscription agreements to sell three million Gig2 shares at $10 per share.[46] The same day, Gig2 entered into convertible note subscription agreements under which Gig2 agreed to issue convertible notes (the "Notes") for an aggregate purchase

---

[41] *Id.* at Cover Page.

[42] *Id.*

[43] Compl. ¶¶ 51, 56-57; Proxy at Cover Page, 18.

[44] *Supra* note 33 and accompanying text.

[45] Compl. ¶ 57 (explaining that "in practical terms, the PIPE and Notes transactions were conditions precedent for the closing of the Merger"); *see also id.* ¶ 80.

[46] *Id.* ¶ 48.

price of $255 million.[47]  The Notes were convertible into 22,173,913 shares of Gig2 common stock at a conversion price of $11.50 per share.[48]

The PIPE and Notes transactions were set to close concurrently with the mergers.[49]

### G.    The Proxy

On May 13, 2021, Gig2 filed its definitive proxy statement concerning the UpHealth and Cloudbreak mergers with the SEC (the "Proxy").[50]  Stockholders were invited to vote on the mergers and related transactions, including the PIPE and Notes deals, at a June 4 special meeting.[51]   Stockholders were also informed that the deadline to redeem their shares was June 2.[52]  The Proxy explained that redeeming stockholders would receive "approximately $10.10" per share from the trust and that

---

[47] *Id.* ¶ 49.

[48] *Id.*  The Notes were due in 2026 and accrued interest at a rate of 6.25% per annum. Under the subscription agreements, Gig2 could force conversion of the Notes after the first anniversary of their issuance if the trading price of Gig2's common stock exceeded a certain threshold.   If the conversion right is exercised—forced by either Gig2, or voluntarily by the Notes holders before the second anniversary of the Notes—Gig2 will be responsible for a portion of the future interest payable on the Notes.  *Id.*

[49] *Id.* ¶ 50.

[50] *Id.* ¶ 52.

[51] *Id.*; Proxy at Cover Page.

[52] Compl. ¶ 52; Proxy at 28, 160.

"[p]ublic stockholders may elect to redeem their shares even if they vote for the [mergers]."[53]

In several places, the Proxy indicated that Gig2 shares were worth $10 each. The Proxy explained that the consideration to be paid to UpHealth and Cloudbreak equity holders consisted of Gig2 stock valued at $10 per share.[54] The pro forma financials in the Proxy referred to "[Gig2] common shares to be delivered at a $10.00 per share valuation" and to the "negotiated market price per share of [Gig2] common stock" as $10.[55] Elsewhere—under the heading "Calculation of the Purchase Price"—the Proxy stated that Gig2 would "pay $990,000,000 to UpHealth and its shareholders by issuing 99,000,000 shares of its common stock," implying a $10 per share value.[56] The Proxy also warned of a general risk of dilution caused by the mergers and the PIPE and Notes financings.[57]

---

[53] Proxy at Cover Page, 26, 160.

[54] *See id.* at A-1-2 (defining "Aggregate Merger Consideration"); B-3 (defining "Business Combination Shares" as "11,000,000 shares of GigCapital2 Common Stock (based on an implied value of $110,000,000 divided by $10.00 per share)" and defining "Common Unit Exchange Ratio").

[55] *Id.* at 141-42.

[56] *Id.* at 140.

[57] Compl. ¶¶ 72 (quoting Proxy at 118), 73 (quoting Proxy at 110), 74; *see also* Proxy at 16-17, 118-19.

The Proxy further disclosed the potential for conflicts of interest between the Sponsor and the Board, on one hand, and Gig2's public stockholders, on the other.[58] It stated that the Board members held "direct or indirect economic interest in the 481,250 Private Placement Units and in the 4,018,987 Founder Shares owned by the Sponsor."[59] The economic values of the individual interests were not disclosed.

On June 4, 2021, stockholders approved the mergers and related transactions, with more than 94% of the votes cast being in favor.[60] Public stockholders redeemed 9,373,567 shares for approximately $94,592,758, leaving $54,935,238 in Gig2's trust account.[61]

### H.    Amended PIPE and Convertible Notes Terms

On June 8, 2021—days after the expiration of public stockholders' redemption rights and the stockholder vote on the mergers—Gig2 announced that it would amend the terms of the PIPE and Notes financing arrangements.[62] Subject to reaching a final agreement with the Notes investors, Gig2 would reduce the Notes' conversion price from $11.50 to $10.65 and the aggregate amount of the Notes from

---

[58] Proxy at 45-46.

[59] *Id.* at 5-6; Compl. ¶ 43.

[60] Compl. ¶ 53; Defs.' Opening Br. Ex. 3 at Item 5.07.

[61] Compl. ¶ 53; Defs.' Opening Br. Ex. 15 at Item 2.01 ("June 15, 2021 Form 8-K/A").

[62] Compl. ¶ 54; Defs.' Opening Br. Ex. 16 at Item 7.01 ("June 8, 2021 Form 8-K").

$255 million to approximately $160 million.[63] Gig2 would also, subject to a final agreement with the PIPE investors, issue to the PIPE investors 300,000 free warrants with an exercise price of $11.50 per share.[64]

The mergers, along with the PIPE and Notes transactions, closed on June 9, 2021.[65] Six days later, Gig2 disclosed that the PIPE and Notes agreements had been finalized according to the revised terms described on June 8.[66]

## I. Post-Merger Performance

Before the June 4, 2021 special meeting, Gig2's stock price traded around the $10 redemption price.[67] As of the filing of the Complaint on September 23, New UpHealth stock traded at $3.75 per share.[68] New UpHealth's stock currently trades around $2.04 per share.[69]

---

[63] Compl. ¶ 54. Commensurately with the reduction in the aggregate amount, the conversion feature of the Notes was reduced from 22,173,913 shares to 15,023,475 shares. June 8, 2021 Form 8-K at Item 7.01.

[64] *Id.* ¶ 55; June 8, 2021 Form 8-K at Item 7.01.

[65] Compl. ¶ 58.

[66] *Id.* ¶ 59; June 15, 2021 Form 8-K/A at Items 1.01, 3.02.

[67] Compl. ¶ 81 (stating that Gig2's stock price closed at $10.08 on May 28, 2021 and $9.92 on June 2, which was the redemption deadline). On December 8, 2022, New UpHealth effected a reverse stock split of 10:1. UpHealth, Inc., Current Report (Form 8-K) (Dec. 5, 2022).

[68] NYSE, UpHealth Incorporated (UPH), https://www.nyse.com/quote/XNYS:UPH (last visited Feb. 28, 2023).

[69] *Id.*

## J. This Litigation

Plaintiff Cody Laidlaw has been a Gig2 (or New UpHealth) stockholder since August 14, 2020.[70] On September 23, 2021, he filed the Complaint in this court.[71]

The Complaint advances three direct claims on behalf of the plaintiff and current and former Gig2 stockholders.[72] Count I is a claim for breach of fiduciary duty against the five members of Gig2's Board.[73] Count II is a claim for breach of fiduciary duty against Katz and the Sponsor as the controlling stockholders of Gig2.[74] Count III is a claim for unjust enrichment against the Sponsor and the director defendants.[75]

The defendants moved to dismiss the Complaint on November 3, 2021.[76] Briefing was completed on May 20, 2022.[77] I heard oral argument on the motion to dismiss on November 18.[78]

---

[70] Compl. ¶ 24.

[71] Dkt. 1.

[72] Compl. ¶¶ 88-117.

[73] *Id.* ¶¶ 97-104.

[74] *Id.* ¶¶ 105-13.

[75] *Id.* ¶¶ 114-17.

[76] Dkt. 7.

[77] *See* Dkt. 19. This action was reassigned to me on August 2, 2022. Dkt. 21.

[78] Dkts. 28, 29.

## II.  LEGAL ANALYSIS

The plaintiff contends that the defendants were motivated to undertake value-destructive mergers at the expense of public stockholders, who would have been better served by redeeming their shares or a liquidation.  The defendants allegedly breached their fiduciary duties by acting on these misaligned incentives and impairing the fair exercise of public stockholders' redemption rights.  Similar claims were first considered by this court in *In re MultiPlan Corp. Stockholders Litigation*.[79]  This court's more recent decision in *Delman v. GigAcquisitions3, LLC* addressed claims even more akin to those pleaded here.[80]  In fact, that opinion addressed allegations that the same central cast of defendants advanced the interests of Katz and the SPAC's sponsor while preventing public stockholders from making an informed redemption decision.[81]

The defendants here—as in *GigAcquisitions3*—moved to dismiss the claims under Court of Chancery Rule 23.1 for failure to plead demand futility and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The defendants' Rule 23.1 argument rests on suppositions that the plaintiff's claims are

---

[79] 268 A.3d 784 (Del. 2022).

[80] 2023 WL 29235, at *8-26.

[81] *Id.* at *2-4.  I have endeavored to avoid rehashing the analysis in *GigAcquisitions3* to the extent possible.  Some degree of duplication is unavoidable.

15

derivative or do not allege any individually compensable harm.[82] More specifically, the defendants assert that the plaintiff is advancing a derivative "bad deal" claim and a duplicative "disclosure-related" claim.[83]

But—again—the claims are neither derivative nor severable. The plaintiff brings duty of loyalty claims "inextricably intertwined" with allegations of misleading disclosures.[84] The direct nature of these claims is confirmed when considering "(1) who suffered the alleged harm" and "(2) who would receive the benefit of any recovery or other remedy."[85] Gig2 public stockholders suffered the harm alleged in the Complaint, which concerns the impairment of their right to redeem.[86] This injury could not run to the corporation: the funds at issue belong to public stockholders, not the SPAC.[87] Any recovery would flow to stockholders

---

[82] Defs.' Opening Br. Supp. Mot. Dismiss (Dkt. 11) ("Defs.' Opening Br.") at 31.

[83] *Id.*

[84] *See MultiPlan*, 268 A.3d at 800; *GigAcquisitions3*, 2023 WL 29325, at *13.

[85] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[86] *See In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 79 (Del. Ch. 1999) (explaining that "a wrongful impairment by fiduciaries of the stockholders' voting power or freedom works a personal injury to the stockholders, not the corporate entity"); *MultiPlan*, 268 A.3d at 803 ("[T]he defendants' disloyal conduct impaired stockholders' redemption rights, giving rise to individual claims."); *GigAcqusitions3*, 2023 WL 29325, at *9.

[87] *See MultiPlan*, 268 A.3d 784 at 802 (explaining that harm resulting from an alleged impairment of public stockholders' redemption rights could not have "run to the corporation" because it concerned a personal right and funds of those stockholders); *GigAcquisitions3*, 2023 WL 29325, at *9-10 (explaining that "the recovery would accrue only to stockholders who suffered a harm to their redemption rights [and that a]ny

16

because the "improperly reduced value" is the loss of their own cash from the trust.[88]

That remedy would necessarily be distinct from any that the corporation could obtain

for an overpayment.[89]

Accordingly, my analysis focuses on whether the plaintiff has stated

reasonably conceivable direct claims against the defendants under the Rule 12(b)(6)

standard. When assessing a motion to dismiss under Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true;
> (ii) even vague allegations are "well-pleaded" if they give
> the opposing party notice of the claim; (iii) the Court must
> draw all reasonable inferences in favor of the non-moving
> party; and [(iv)] dismissal is inappropriate unless the
> "plaintiff would not be entitled to recover under any
> reasonably conceivable set of circumstances susceptible of
> proof."[90]

---

restoration of value to the Company that indirectly benefitted stockholders pro rata would be inapt").

[88] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1261 (Del. 2016).

[89] *See MultiPlan*, 268 A.3d at 804 n.118 (demonstrating that the recovery to stockholders is distinct from any recovery that the corporation could seek for an overpayment claim); *GigAcquisitions3*, 2023 WL 29325, at *10 (explaining that "a direct claim brought by public stockholders would not lead to a double recovery if a derivative overpayment claim were brought by the SPAC").

[90] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

17

This pleading standard is "minimal."[91]  I am, however, "not required to accept every strained interpretation of the allegations proposed by the plaintiff."[92]

## A. Entire Fairness Applies.

"The 'reasonable conceivability' pleading standard of Rule 12(b)(6) 'asks whether the allegations in the complaint could entitle a plaintiff to relief,' which in turn 'depends upon the level of scrutiny under which those allegations are reviewed.'"[93]  The plaintiff contends that he can overcome the presumption of the business judgment rule due to multiple conflicts of interest detailed in the Complaint. The defendants, of course, disagree.

Delaware courts will apply entire fairness—our law's most stringent standard of review—in two circumstances.  The first is where "the propriety of a board decision is in doubt because the majority of the directors who approved it were grossly negligent, acting in bad faith, or tainted by conflicts of interest."[94]  The

---

[91] *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) (explaining that the "pleading standards for purposes of a Rule 12(b)(6) motion 'are minimal'" (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011))).

[92] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[93] *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *9 (Del. Ch. Feb. 29, 2016) (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014)).

[94] *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006); *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002)).

18

second is where the plaintiff "presents facts supporting a reasonable inference that a transaction involved a controlling stockholder" engaged in a conflicted transaction, to the detriment of other stockholders.[95] The Complaint sufficiently pleads facts making it reasonably conceivable that both circumstances are present.[96]

### 1. Conflicted Controller

The parties do not dispute that the Sponsor is properly viewed as the controlling stockholder of Gig2.[97] A transaction involving a controlling stockholder may be viewed as conflicted, such that entire fairness review is warranted, where the controller "extract[s] something uniquely valuable to [itself]" at the expense of other stockholders.[98]

The plaintiff alleges that the Sponsor achieved a "unique benefit" at the expense of public stockholders, considering the dramatically different outcomes they

---

[95] *Id.* (citing *Crimson Expl.*, 2014 WL 5449419, at *9).

[96] The defendants argue that *Corwin* ratification is available if the court concludes that entire fairness applies because a majority of the Board is conflicted. This court rejected that argument in *GigAcquisitions3*, explaining that the stockholder vote on the de-SPAC merger was "of no real consequence" because "redeeming stockholders remained incentivized to vote in favor of a deal—regardless of its merits—to preserve the value of the warrants included in SPAC IPO units." 2023 WL 29325, at *19-20. The vote at issue here had the same structural issues. In any event, the vote was not fully informed.

[97] *See id.* at *16-17 (explaining that it was reasonably conceivable that a sponsor was the SPAC's controlling stockholder because despite owning less than 50% of a SPAC's voting power, the "sponsor of a SPAC control[led] all aspects of the entity from its creation until the de-SPAC transaction . . . [and] held unrivaled authority over [the SPAC's] business affairs"); Defs.' Reply Br. Supp. Mot. Dismiss (Dkt. 19) ("Defs.' Reply Br.") at 16-19.

[98] *Crimson Expl.*, 2014 WL 5449419, at *13.

19

could experience from a de-SPAC merger.[99] The Sponsor would prefer a good deal over a bad one—though it would still receive a windfall in the latter scenario. The Sponsor would be left empty-handed if Gig2 did not merge, since the Founder Shares and Private Placement Units would be worthless.[100] Gig2's public stockholders, by contrast, stood to recoup their full investment plus interest in a liquidation. For public stockholders, no deal was preferable to one worth less than $10.10 per share.

The plaintiff further asserts that competing interests arose in the context of redemptions. After the merger agreements were signed, the Sponsor had an interest in minimizing redemptions because the deals were conditioned on Gig2 having at least $150 million in total cash.[101] By minimizing redemptions, the Sponsor reduced the chance that the mergers would fail. Fewer redemptions would also increase the value of the Sponsor's interest if the mergers closed.[102] Thus, the Sponsor "effectively competed with the public stockholders for the funds held in trust and

---

[99] Pl.'s Answering Br. Opp'n Mot. Dismiss (Dkt. 15) at 33; *see MultiPlan*, 268 A.3d at 810-12; *GigAcquisitions3*, 2023 WL 29325, at *16-17.

[100] *See supra* notes 12 & 24 and accompanying text (describing how the Sponsor waived liquidation rights).

[101] *Supra* note 43 and accompanying text.

[102] *See GigAcquisitions3*, 2023 WL 29325, at *21-23 (explaining how fewer redemptions would increase net cash per share, which is commensurate to what the SPAC "could reasonably expect to receive . . . in return").

would be incentivized to discourage redemptions if the deal was expected to be value decreasing, as the plaintiffs allege."[103]

The essential conflict alleged in the Complaint arises from the Sponsor's motivations to avoid a liquidation and to discourage redemptions in order to maximize the amount of cash in the trust for funding the mergers.[104]  The plaintiff asserts that the Sponsor reaped tremendous upside from the mergers while public stockholders lost value. Upon closing, the Founder Shares were worth more than $37 million—a 147,900% gain on a $25,000 investment.[105]  Those shares were still worth $15.1 million as of the filing of the Complaint on September 23, 2021.[106] Public stockholders, however, were left with shares worth $3.75 as of that date, rather than the $10.10 per share available upon redemption or liquidation.[107]

---

[103] *MultiPlan*, 268 A.3d at 811; *see also GigAcquisitions3*, 2023 WL 29325, at *17.

[104] The multiple extensions to the merger completion window and Gig2's initial identification of Bolder Industries as a merger target do not require a different outcome at this stage.  *See supra* notes 26-35 and accompanying text.  "Time left in the completion window does not change the potential for misaligned incentives."  *MultiPlan*, 268 A.3d at 811.  Further, it is rational to infer that challenges in securing a merger target would have motivated the defendants to take the deal in hand, irrespective of whether it was the best deal for public stockholders.  *See GigAcquisitions3*, 2023 WL 29325, at *17 ("Drawing all inferences in the plaintiff's favor, the Sponsor might have desired to take the money in hand and focus on the next 'Gig' SPAC rather than continuing to seek a target for [Gig2].").

[105] Compl. ¶ 85.  The shares in the Private Placement Units were worth more than $4.5 million as of the closing.

[106] *Id.*

[107] NYSE, UpHealth Incorporated (UPH), https://www.nyse.com/quote/XNYS:UPH (last visited Feb. 28, 2023).  The defendants maintain that the Sponsor's incentives were aligned with public stockholders because of a lock-up agreement requiring the Sponsor to refrain

## 2. Conflicted Board

The plaintiff also avers that entire fairness review is required because the directors were self-interested in the mergers and were beholden to Katz.

"Directors are 'self-interested' when they . . . expect to 'derive any material personal financial benefit from [a transaction] in the sense of self-dealing.'"[108] Katz, by virtue of his ownership and control of the Sponsor, was interested in the mergers.[109] Although the other Board members were compensated in cash, the plaintiff alleges that they stood to profit due to their direct or indirect interests in the Sponsor's Founder Shares and Private Placement Units.[110] The nature and scale of the directors' interests, however, are not pleaded.[111] Without these facts, I cannot

---

from selling its shares for twelve months or until the stock reached a particular target price. Defs.' Opening Br. 11, 45. Siding with the defendants, however, would require the court to draw inferences against the plaintiff. At present, I must infer that even if the Sponsor had to wait to reap the upside from its investment, it would still favor a merger over a liquidation. *See GigAcquisitions3*, 2023 WL 29325, at *16 n.169. The cases relied upon by the defendants to argue otherwise did not involve situations where the alleged controller was incentivized to pursue a deal because the alternative was the complete loss of its investment. *See In re Morton's Rest. Grp. Inc. S'holders Litig.*, 74 A.3d 656, 662 (Del. Ch. 2013); *Rudd v. Brown*, 2020 WL 5494526, at *11 (Del. Ch. Sept. 11, 2020).

[108] *Calesa*, 2016 WL 770251, at *11 (quoting *Orman*, 794 A.2d at 23 (cleaned up)).

[109] Compl. ¶¶ 6, 37.

[110] *Id.* ¶¶ 6, 10, 43, 106; First Extension Proxy at 27.

[111] *See GigAgquisitions3*, 2023 WL 29325, at *17 (declining to conclude it was reasonably conceivable that the director defendants were self-interested where the plaintiff did not plead the "size" of the defendants' interests in the sponsor "or any context for their materiality to the directors").

22

assess whether the directors stood to receive material financial benefits that could create divided loyalties.

Regardless, it is reasonably conceivable that a majority of the Board lacked independence from Katz.[112] A "lack of independence can be shown when a plaintiff pleads facts" demonstrating that "the directors are 'beholden' to [the interested party] or so under their influence that [the directors'] discretion would be sterilized."[113]

In *GigAcquisitions3*, this court determined at the pleading stage that three of the same director defendants here—Dinu, Moitto, and Mikulsky—conceivably lacked independence from Katz. That analysis applies to the present matter. Dinu is Katz's spouse and a founding managing partner of GigCapital Global alongside Katz.[114] Miotto is a GigCapital Global partner, and Mikulsky is a GigCapital Global

---

[112] *Orman*, 794 A.2d at 29 (explaining that a director "is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders").

[113] *Id.* (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[114] Compl. ¶ 27; *see GigAcquisitions3*, 2023 WL 29325, at *18; *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) ("When it comes to life's more intimate relationships concerning friendship and family, our law cannot 'ignore the social nature of humans' or that they are motivated by things other than money, such as 'love, friendship, and collegiality.'" (quoting *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003))).

strategic advisor.[115] Dinu, Miotto, and Mikulsky each hold various roles, including other board positions, within Katz's GigCapital Global enterprise of companies.[116]

Finally, Frostig serves as a director of GigCapital6, Inc.—another Katz-sponsored SPAC.[117] It is reasonable to infer that Frostig would "expect to be considered for directorships" within the GigCapital Global enterprise of companies "in the future."[118]

## B. The Plaintiffs' Claims are Reasonably Conceivable.

Given the application of entire fairness review, the plaintiff need only "allege some facts that tend to show the transaction was not fair" to survive the defendants' motion to dismiss.[119] The plaintiff does so by alleging disloyal breaches of the duty of disclosure that indicate unfair dealing.[120] This is sufficient to state a

---

[115] Compl. ¶¶ 28-29; *see GigAcquisitions3*, 2023 WL 29325, at *18.

[116] Compl. ¶¶ 27-29; *see GigAcquisitions3*, 2023 WL 29325, at *18.

[117] Compl. ¶ 30.

[118] *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *7 (Del. Ch. Sept. 28, 2015).

[119] *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996).

[120] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 703, 711 (Del. 1983) (concluding that a merger did "not meet the test of fairness" because "[m]aterial information" was withheld from minority stockholders "under circumstances amounting to a breach of fiduciary duty" where "obvious conflicts" were alleged). Although the plaintiff does not specifically address the unfair price aspect of the unitary fairness analysis, "[u]nfair price can be inferred from the allegation that public stockholders were left with shares of New Lightning worth far less than the $10 per share redemption price." *GigAcquisitions3*, 2023 WL 29325, at *25.

non-exculpated breach of fiduciary duty claim against the defendants. In addition, the plaintiff has pleaded a viable unjust enrichment claim.

### 1. Breach of Fiduciary Duty

The plaintiff contends that the defendants—acting out of conflicted interests—breached their fiduciary duties by impairing the exercise of public stockholders' redemption rights. The alleged impairment took the form of disclosures containing materially misleading statements and omitting material information. Material information is that which a reasonable stockholder would view as "significantly alter[ing] the 'total mix' of information made available."[121] If the Proxy had contained all material information needed for stockholders to make an informed redemption decision, dismissal might arguably be an appropriate outcome. But that is not the case.

The plaintiff avers that the Proxy was materially deficient in several respects. First, the Proxy indicated that the Gig2 shares being contributed to the mergers were worth $10 per share when there was less than $10 in net cash underlying those shares. Second, the Proxy failed to disclose that the PIPE and Notes transactions would be renegotiated to public stockholders' detriment. Third, the Proxy omitted

---

[121] *Gantler v. Stephens*, 965 A.2d 695, 710 (Del. 2009) (quoting *Arnold v. Soc'y for Savings Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994)).

the extent of the Board members' financial interests in the Sponsor.[122]  I consider

each in turn and conclude that the first two sufficiently impugn the fairness of the

process at this stage.

### a.    Net Cash Per Share

Like other SPACs, Gig2 presented its public stockholders with a choice.  They

could redeem their shares for $10 each plus interest, or they could invest in New

UpHealth.  The plaintiff maintains that the amount of net cash these stockholders

would invest was not $10 per share, as the Proxy suggested.  Rather, Gig2's net cash

depended on dilution and dissipation caused by various transactions, such as the

issuance of the Founder Shares and the Notes financing.[123]

In *GigAcqusitions3*, this court concluded that a SPAC's net cash per share

may be material to stockholders' investment decision depending on the magnitude

of any dilution or dissipation of cash.[124]   There, although the proxy statement

---

[122] The plaintiff also asserted that the Proxy was misleading because it raised the specter of there being insufficient funds available to pay the redemption price.  Compl. ¶¶ 76-79.  In support, the plaintiff argues that the likelihood of this happening was low in view of the experiences of other SPACs.  To agree with the plaintiff would require me to rely on evidence outside the pleadings about unrelated transactions, which I decline to do.

[123] *See* Michael Klausner, Michael Ohlrogge & Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. Reg. 228, 246-54 (2022).

[124]  *GigAcquisitions3*, 2023 WL 29325, at *23 (explaining that the "the sizeable difference between the $10 of value per share Gig3 stockholders expected and Gig3's net cash per share after accounting for dilution and dissipation of cash is information 'that a reasonable shareholder would consider . . . important in deciding' whether to redeem or invest" (quoting *Rosenblatt v. Getty Oil Co*., 493 A.2d 929, 944 (Del. 1985))).

indicated that the merger consideration to be paid to the target's stockholders consisted of SPAC shares worth $10 per share, the net cash per share was actually "less than $6 per share after accounting for considerable dilution."[125]

The plaintiff here alleges an even wider gulf between the value per share public stockholders were told to expect and the SPAC's net cash per share. The Proxy represented that Gig2 shares were worth $10 each.[126] The plaintiff maintains, however, that the net cash per share was $5.19.[127] Thus, "the Proxy's statement that [Gig2] shares were worth $10 each was false—or at least materially misleading."[128] Given the difference between the Proxy's representations and the net cash per share,

---

[125] *Id.* at *21.

[126] *See supra* notes 54-56 and accompanying text.

[127] Oral Arg. Tr. (Dkt. 29) 59; Compl. ¶¶ 13-14, 18, 64-65, 68 (stating that the net cash per share was "less than $7.00"). Generally speaking, net cash per share can be determined by the following formula: (Cash – Costs) / Pre-Merger Shares. The plaintiff here estimates the total cash (from the IPO proceeds less the early redemptions, the private placements, and the PIPE financing) to be roughly $180 million. The costs (from the value of the warrants included in the IPO units, the deferred underwriting fees, and the financial advisory and other fees) were estimated to be roughly $57 million. Dividing the net cash by roughly 24 million—the total number of pre-merger shares (including the IPO shares less the early redemptions, the 1/20 rights included in the units, the Founder Shares, and the shares and units sold in the private placements)—yields $5.19 per share. Oral Arg Tr. 52-59. The plaintiff believes that the $5.19 figure is an overestimate because it does not account for certain costs, such as redemptions by public stockholders in connection with the June 4 special meeting, the warrants in the Private Placement Units, the conversion feature in the Notes, and the free warrants given to PIPE investors following the June 4 special meeting. *Id.* at 59.

[128] *GigAcquisitions3*, 2023 WL 29325, at *23.

27

Gig2 stockholders "could not logically expect to receive $10 per share of value in exchange."[129]

The Proxy disclosed some information relevant to public stockholders' assessment of the value underlying Gig2's shares. But that information was incomplete and strewn across various pages, making it difficult for even a sophisticated investor to discern. "[P]roxies should be lucid, and not a game of Clue."[130]

Moreover, it is reasonable to expect that the defendants understood the importance of net cash per share to the value of the mergers and had such information readily available to them. The defendants touted their experience and qualifications elsewhere to justify their decision not to retain a financial advisor.[131] Nothing

---

[129] *Id.* at *21-23 ("If non-redeeming stockholders were exchanging Gig3 shares worth $10 each, they could reasonably expect to receive equivalent value in return." (citing Klausner, Ohlrogge & Ruan, *Sober Look*, supra note 123, at 287-88)).

[130] *Salladay v. Lev*, 2020 WL 954032, at *13-16 (Del. Ch. Feb. 27, 2020) (concluding at the pleading stage that disclosures were deficient where the inputs for calculating ownership percentages were strewn throughout the document); *see also Voigt v. Metcalf*, 2020 WL 614999, at *24 (Del. Ch. Feb. 10, 2020) (noting that although "the inputs for calculating the $638 million valuation appear[ed] in the Proxy Statement," they were buried in a note and otherwise provided without context, making it reasonable to infer that the disclosures were ineffective).

[131] *See* Proxy at 184 ("GigCapital2'[s] management, including its directors and advisors, has many years of experience in both operational management and investment and financial management and analysis and, in the opinion of the GigCapital2 Board, was suitably qualified to conduct the due diligence and other investigations and analyses required in connection with the search for a business combination partner.").

prevented the defendants from disclosing Gig2's net cash per share in a straightforward manner.

### b. Modifications to PIPE and Notes Terms

Additionally, the Proxy did not provide any indication that the terms of the PIPE and Notes would require significant modifications. The reduction in the Notes' conversion price from $11.50 to $10.65 and the issuance of 300,000 free warrants to the PIPE investors meaningfully disadvantaged Gig2's public stockholders.[132] Thus, it is reasonably conceivable that the amended terms would have been material to Gig2 public stockholders deciding whether to redeem or invest.[133]

The defendants argue that the plaintiff failed to adequately plead that the defendants knew, at the time the Proxy was filed, that the terms of the PIPE and Notes would be altered.[134] But the facts alleged support a reasonable inference of the defendants' knowledge.[135]

---

[132] Compl. ¶ 54 (citing June 8, 2021 8-K); *see supra* Section II.B.1.a.

[133] In addition, it is reasonably conceivable that changes in these terms would have been material to stockholders voting on the PIPE and Notes deals. *See* Proxy at Cover Page (soliciting stockholder votes to approve Proposal No. 3, which would facilitate the PIPE and Notes transactions).

[134] *Cf. Pfeffer v. Redstone*, 965 A.2d 676, 687 (Del. 2009) ("[L]ogically the directors could not disclose," and therefore had no duty to disclose, "allegedly missing facts" that they "did not know or have reason to know.").

[135] *See Solomon*, 672 A.2d at 38 ("[T]he Court must give the [plaintiff] 'the benefit of all reasonable inferences that can be drawn from its pleading.'" (quoting *In re USACafes, L.P, Litig.*, 600 A.2d 43, 47 (Del. Ch. 1991))).

The Complaint states that the PIPE and Notes terms were modified to ensure that the Company had $150 million in cash, which was a closing condition for the mergers.[136] At the time of the Proxy, the Company had less than $150 million in its trust account due to redemptions associated with the extension amendments.[137] Additional financing was therefore necessary to ensure the condition was met, especially considering that more stockholders might redeem.[138] The plaintiff alleges that the Board amended the terms of the PIPE and Notes agreements, making concessions to those investors "in order to bring those transactions over the finish line."[139]

Further, the modified terms were announced just four days after stockholders voted on the merger and six days after the redemption deadline. Two potential inferences flow from that timing. One inference is that the defendants had to undertake unexpected, last-minute negotiations to amend the terms of the PIPE and Notes arrangements. The other is that they knew before the redemption deadline and stockholder vote that the terms of the PIPE and Notes would be revised but failed

---

[136] Compl. ¶ 80.

[137] *Supra* note 33 and accompanying text.

[138] Public stockholders had earlier redeemed a total of $24,572,799 in connection with the extensions. *Supra* notes 29-32 and accompanying text. Thus, it is reasonable to infer that additional public stockholders would redeem in connection with the mergers vote. Indeed, public stockholders redeemed 9,373,567 shares for approximately $94,592,758, leaving $54,935,238 in Gig2's trust account. Compl. ¶ 53; June 15, 2021 Form 8-K/A.

[139] Compl. ¶ 80.

to make a timely disclosure. At present, I must draw the inference favoring the plaintiff.[140]

### c. Director Financial Interests

Finally, the plaintiff avers that the defendants failed to disclose specific details of the Board's financial interests in the mergers. Directors are under an obligation to disclose the sort of separate interests that might incentivize them to abandon the interests of stockholders in a proposed transaction.[141] But, as explained above, I lack sufficient information to assess whether any such interests were present.[142]

The Proxy states that the members of the Board had "direct or indirect economic interest in the 481,250 Private Placement Units and in the 4,018,987 Founder Shares owned by the Sponsor."[143] It disclosed that the directors' financial interests were aligned with those of the Sponsor, which would only see a payoff if a

---

[140] *Solomon*, 672 A.2d at 38 ("[T]he Court must give the [plaintiff] 'the benefit of all reasonable inferences that can be drawn from its pleading.'" (quoting *In re USACafes, L.P, Litig.*, 600 A.2d 43, 47 (Del. Ch. 1991))).

[141] *See In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) ("[A] reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.").

[142] *See supra* notes 109-12 and accompanying text.

[143] Proxy at 5-6.

merger closed.  There are no facts alleged suggesting that the directors' interests in the Sponsor created a material personal benefit requiring further disclosure.[144]

*          *          *

As discussed above, the plaintiff sufficiently pleaded that Katz was self-interested in the mergers and that the other directors lacked independence from Katz.  The plaintiff asserts that the defendants were motivated by these interests to discourage redemptions and ensure that the mergers closed.  Doing so would yield a windfall for the Sponsor but a loss for public stockholders.  Thus, the plaintiffs' claims concerning materially deficient disclosures are "inextricably intertwined with issues of loyalty."[145]  These claims are not exculpated under 8 *Del. C.* § 102(b)(7).[146]

---

[144] *See, e.g.*, *Kihm v. Mott*, 2021 WL 3883875, at *22 (Del. Ch. Aug. 31, 2021) (rejecting a disclosure claim where a director's conflict was disclosed and specifics allegedly omitted would "not add to the total mix of stockholder information" given the absence of allegations indicating a material conflict), *aff'd*, 2022 WL 1054970 (Del. Apr. 8, 2022) (TABLE).

[145] *Emerald P'rs v. Berlin*, 787 A.2d 85, 93 (Del. 2001); *see MultiPlan*, 268 A.3d at 800; *GigAcquisitions3*, 2023 WL 29325, at *13.

[146] *See GigAcquisitions3*, 2023 WL 29325, at *25; *MultiPlan*, 268 A.3d at 815.  The claims are also not incognizable holder claims, which concern circumstances where a stockholder is "wrongfully induced to *hold* stock instead of selling it."  *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1132 (Del. 2016) (quoting *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1256 (Cal. 2003) (emphasis in original)).  Unlike a holder claim, which is predicated on stockholder inaction, the plaintiff's claims concern an investment decision.  *See MultiPlan*, 268 A.3d at 807-08; *GigAcquisitions3*, 2023 WL 29325, at *10-11.  "[A] stockholder who opted not to redeem chose to invest her portion of the trust in the post-merger entity.  This affirmative choice is one that each SPAC public stockholder must make.  There is no continuation of the status quo."  *GigAcquisitions3*, 2023 WL 29325, at *10.  Nor are the claims based in contract.  *See id.* at *12; *MultiPlan*, 268 A.3d at 805-07.

32

## 2. Unjust Enrichment

To state a claim against the Sponsor and the Board for unjust enrichment, the plaintiff must allege facts making it reasonably conceivable that the defendants received an unjustified benefit at the expense of Gig2's stockholders. "Unjust enrichment is the 'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[147] The plaintiff must show an enrichment, an impoverishment, a relation between the enrichment and impoverishment, and the absence of justification.[148]

The Complaint provides grounds to infer that the defendants were incentivized to enter a value-destructive de-SPAC merger that allowed the Sponsor to make colossal returns on a nominal investment. The defendants were also motivated to minimize redemptions by issuing a materially misleading proxy statement. The Sponsor's gain purportedly came at public stockholders' expense.

---

[147] *Metcap Secs. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 (Del. Ch. Feb. 27, 2009) (quoting *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999)).

[148] *See Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998); *see also Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 351 (Del. Ch. 2022) (describing the absence of a remedy at law as relevant to the determination of whether jurisdiction exists in equity).

The unjust enrichment claim is therefore reasonably conceivable and "survives along with the fiduciary duty claims."[149]

## III. CONCLUSION

For the reasons described above, the defendants' motion to dismiss is denied.

---

[149] *GigAcquisitions3*, 2023 WL 29325, at *26 (observing that there is no bar to allowing parallel unjust enrichment and fiduciary duty claims to survive a motion to dismiss but noting that double recovery is prohibited (citing *MCG Cap. Corp. v.* Maginn, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010); *Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 592 (Del. 2015))).